[No. 3057.]

## JOSE ANGEL SEGURA v. THE STATE.

MURDER—EVIDENCE—CASE STATED.—A witness for the State, in a trial of a murder case, was permitted, over objection, to testify that on the morning of the day on which the deceased was killed, he rode up to where the deceased was at work; that the deceased seemed agitated and excited and told him that he, deceased, was afraid of that Mexican, meaning the defendant; that this conversation occurred about two hours before the killing occurred, and that the defendant was in sight at the time, but not near enough to hear the said conversation between the witness and the deceased. *Held*, that in the admission of such evidence the trial court erred, inasmuch as it was clearly hearsay, and did not come within any of the exceptions to the general rule which rejects hearsay evidence.

APPEAL from the District Court of McMullen. Tried below before 'H. W. Herron, Esq., Special Judge.

The indictment in this case charged the appellant with the murder of John Williams, in McMullen county, Texas, on the twenty-second day of April, 1880. The trial resulted in the appellant's conviction of murder in the first degree, and his punishment was affixed at a life term in the penitentiary.

C. W. Barnes was first introduced as a witness for the State. He testified that he knew the defendant, and identified him in open court. He did not know John Williams, the deceased. The witness was one of the jurors summoned to hold the inquest over the body of the deceased. That inquest was held over the body in McMullen county, near Campbell's ranch, on or about the twenty-second, twenty-third or twenty-fourth of April, 1880. Judge Lowe, M. H. Martin, Doctor Frazier, R. W. Minus, witness, and a gentleman whom the witness did not know, were present. This party reached Campbell's ranch after sundown, and, next morning, made as thorough an examination as possible of all the circumstances of the killing. They looked for horse tracks near the place where the body lay, in McMullen county. Mr. Minus and Mr. Martin described a circle around the body twice, for a distance of two or three hundred yards. The witness circled around the body for more than a quarter of a mile. No fresh horse tracks were found either at the body or within the radius described by witness, Minus and Martin. A wound, evidently made with an ax, or some similar weapon, was found on the body of the deceased, just at the junction of the neck and shoulder. The deceased had been shot in several places. One ball entered the back of the head, which was powder burned, and passed out at the mouth. One struck the deceased on the chin, and another on the elbow. Two entered the back of the body, and passed out through the chest. Blood was first discovered within three feet of a fence where, evidently, some one had been at work. From this point a trail led zigzag to the point where the body was found.

The defendant was brought before the jury of inquest and interrogated. He said that he and the deceased were engaged in stretching a fence wire, and that, while he was passing under a wagon that stood by, three men came up, and a white man engaged the deceased in an excited conversation. He said that, as he passed through the fence to the horses hitched to the wagon, to hold them, one of the three men, a Mexican, met and struck him with a pistol, and told him to leave there; that he then ran off, and presently, while fleeing, heard five pistol shots fired in rapid succession. He continued his flight to Campbell's house, where he reported the occurrence. Examination for horse tracks was made. There was a small lake near by, where some colt tracks were found going down to and up from the water. The blood showed that the deceased ran directly across

the grass plot where the defendant said that the horses stood when he left. Witness looked at the wound the defendant said he got over the eye, and it looked like an ordinary scratch. The jury of inquest rendered a verdict, but the witness did not know what had been done with the body. No arms were found on the body of the deceased. A belt and an empty pistol scabbard were buckled around the waist. When examined on the ground before the jury of inquest, the defendant said that, just before the assault by the three men, he went to get a piece of plank, but failed to get it. When examined in the afternoon, he said that he got the piece of plank, but did not use it. This was the only discrepancy between his two statements.

Cross-examined, the witness stated that he never saw a man struck with a six shooter. He did not think that the wound on the defendant could have been made with a six shooter. He did not think that a pistol sight could have made that wound. Defendant said that he had gone up the fence to get a piece of plank, and that, as he returned, a white man and two Mexicans rode up. The white man engaged the deceased in an excited conversation, and the deceased ordered him, defendant, to look after the two horses hitched to the wagon with which they were stretching wire; that he saw the white man strike the deceased with an old ax, and that he started toward the deceased, when one of the Mexicans struck him with a pistol; that he then ran, and after he had progressed a short distance in his flight, he heard five pistol shots in rapid succession. While on the ground, the defendant said that he cut a mesquite pole to put under the wagon axle, and pointed to it, and witness saw where it had been cut. The body had five wounds on it, one of them evidently inflicted by a dull instrument. This wound was deep— how deep, the witness did not know—and extended nearly across the neck. The witness could not say that a wound twenty-four hours c 1 would appear larger than when first made. The witness h. heard surgeons say that wounds inflicted by dull instrumer. s drive the blood away, and that the blood will not adhere to  ie instrument. The ground was hard and dry at the point where the defendant said the horses stood. Defendant did not say that the horses stood there all the time. He said that both he and Williams stood near the wagon. No horse tracks were found either where the defendant said the wagon horses stood or where he said the horses of the three men stood. Witness went back to the place where the body was found, next

day, and saw some colts pass over the ground, and saw that, in passing, they left plainly defined tracks. Those tracks were made after the examination at the inquest was made. Witness examined an ax produced on the examination, but found no blood on it. The break of the helve was fresh, and there was no blood on it.

Sheriff M. H. Martin testified, for the State, that he knew the defendant but did not know the deceased. On or about the twenty-second or twenty-third day of April, 1880, he received a note from Mr. Campbell to the effect that the body of a dead man had been found on his premises. Witness summoned a jury, and, with Judge Lowe, repaired to Campbell's ranch, arriving there after dark. The inquest was held next day. The witness heard but little of the testimony. A thorough examination of the ground was made, but no fresh horse tracks were found in the neighborhood of the body. Appearances indicated that some parties had been engaged in putting down posts whereon to stretch a fence. An old ax was found near the post where the blood was. The trail of the deceased was tracked by blood to the place where he fell. He was wounded in the manner described by the witness Barnes.

On his cross-examination, the witness said that he examined the ax, but found no blood on it. He did not know whether or not blood would adhere to a dull instrument. The handle of the ax had been cut off short and was split. It requires a hard blow to break an ax handle. The nature of the ground was hard and dry, though there was some grass on the hill. A shower of rain had fallen a few days before.

Judge M. F. Lowe, county judge of McMullen county, testified, for the State, that he knew defendant, but did not know deceased. He received notice from Campbell of the finding of a dead body on his ranch, on the twenty-second, twenty-third or twenty-fourth of April, 1880. He notified the sheriff, had a jury of inquest summoned, and repaired to Campbell's, reaching there about dark, and began the inquest at daylight next morning, on the ground. The witness did not remember the locality of the five or six wounds on the body. After viewing the body, the witness had the defendant sworn as a witness, and Mr. George Berksdale as interpreter. Defendant was asked in regard to the killing, and said that he went off to get a piece of plank to brace the axle of the wagon, in order to make the wheel revolve and stretch the wire they were using in making a fence, and when

he came back he saw two Mexicans and a white man talking to the deceased in an excited manner; that of the words used he only understood the words "son of a b—h;" that as he crossed to the outside of the fence to hold the horses, he saw the white man take up the ax and strike the deceased; that deceased thereupon called to him, and he started toward deceased, when one of the Mexicans struck him with a pistol; that he then ran off a few feet and saw the white man reach for his six shooter. The defendant, as required, pointed out where he said the horses ridden by the three men stood, but no tracks or other traces could be found. He showed where he said the deceased was driving a staple in the post. Blood was found at that point, and also an old ax. Blood was also found where the defendant said the horses stood. Doctor Frazier tested the ax by wetting his finger and rubbing over it, and said that there was blood on it. Witness saw blood on the ax midway between the back and blade, and did not know but that there was blood on the blade. Mr. Barnes and Mr. Martin were present. All of the jury of inquest concluded that there was blood on the ax. From the point where the blood was first found at the post, where the staple was said to have been driven, to the point where the defendant located the horses, the distance was some eight or ten feet. The deceased, in running from the point where the blood was first discovered, as shown by his trail, passed over the ground where, according to the defendant's statement, the horses stood.

By agreement of counsel for the State and defense, the State read the testimony of John Donahue, as reduced to writing on the *habeas corpus* trial of J. M. and Duncan Campbell, charged with this same offense. The agreement recited that, without laying a predicate, the defense would be permitted to prove that said witness, Donahue, had made other and different statements to those made on the hearing under *habeas co... ...*. That testimony was as follows:

"My name is John Donahue. I am acquainted with J. M. and Duncan Campbell. They are in court. One or two nights before Williams was killed, Duncan Campbell and his father concocted a plan to murder Williams. They made a contract with a Mexican, agreeing to pay him three hundred dollars to assassinate John Williams. That Mexican is Jose Angel Segura, the same who is now charged as principal for the killing of John Williams. Jose Angel Segura was working on Campbell's ranch,

and owed the Campbells three hundred dollars, and they promised that they would discharge him from this debt if he would kill Williams, and would afterward pay him for his work. Duncan Campbell was interpreter, and was to go to Segura and make the trade with him, and give directions and make the plans as to how the man was to be killed. The conversation occurred at night between J. M. and Duncan Campbell, at J. M. Campbell's ranch. They were under a kind of brush arbor, about thirty yards from the house. I was behind some barrels and brush very near to them—not over six feet distant. They agreed that Segura should do the killing in the manner that I have stated. Duncan Campbell agreed to make the trade, and they both would help him out if he would stick to the tale they would make up for him. Williams was at that time working on a wire fence for J. M. Campbell, and was in camp where he was at work. Williams was going to leave the ranch as soon as he got through with the fence, which was the day he was killed. He would have gotten through with the fence on the evening of the day he was killed. He was killed between eleven and twelve o'clock in the daytime, two days after the agreement was made. I saw Williams after he was killed. I saw his dead body. I saw him about one hour or one and a half hours after he was killed, between eleven and twelve o'clock. I had not seen him before for three or four days. He was lying on his face, and there were five bullet holes in him, and a cut on his neck or collar bone. This was in McMullen county.

"The defendants (the Campbells) left the night I heard the conversation, before I did. I was there when they went there. I happened there accidentally. That was in the early part of the night, a little after dark. I was standing so they would not be apt to observe me. I was on the ranch the day that Williams was killed. Duncan Campbell was out on the range, and J. M. Campbell was at his house. Segura was to report to J. M. Campbell when the murder was committed, and J. M. Campbell was to send after Duncan Campbell, who was to fix up the story for the Mexican about the killing. The Mexican was to kill Williams at no particular place, but on the fence where he was working. Duncan was to be out on the range in company with his hands, so that he could be proved out. J. M. Campbell was to be at his house so that he could prove out. Duncan Campbell was to go to Segura the night I heard this conversation. Segura lived about one hundred and fifty yards from J. M. Campbell's

house. I saw Segura directly after the killing was done, or about a half hour after the killing. He had blood on his face. Segura and Campbell came down to the wool house where I and Cunningham were, and said that Williams was killed, and asked us to go down where the body was. We all ate dinner and went down. It was probably one o'clock when we got there. The body was stiff when we got there. The weather was very hot.

" In the conversation I heard, as before stated, between J. M. and Duncan Campbell, J. M. Campbell told his son that Williams was going to leave there, and was going to break them up, and that they would have to kill him to stop him. J. M. Campbell did the talking and Duncan agreed with the old man. I saw Duncan Campbell after the killing. Segura reported the killing, and then went in search of Duncan Campbell. J. M. Campbell told Segura to go out and bring Duncan in, but not to speak to anybody about the killing until after he saw Duncan. We met Segura and Duncan when we were coming from Williams's body. Segura stayed on the ranch after the killing till he was arrested, which was in a few days. The defendants were both on the ranch when arrested."

Cross-examined: "I had lived on Campbell's ranch seven or eight years before this happened. Segura had been there about five years, and Williams about six months. I was acquainted with all the places I have spoken about. It was directly after dark when I heard the conversation. I don't remember the day of the week or the month. The moon was shining. I was standing up when I heard this conversation, on one barrel on the top of another. The brush was mesquit. There was brush and barrels between me and J. M. and Duncan Campbell, when I heard this talk. I accidentally stopped there. The Campbells came up when I was there. I never told Williams of this conversation, nor the wife of Williams, who lived in the same house that I did. Myself and Williams were friendly. I never told Rufus Holland while I was in jail here that Tal McNeil had Williams killed. I don't remember that I told Green Alford that Duncan Campbell had nothing to do with the killing of Williams. I never saw Duncan Campbell and Segura together after I heard the conversation till Williams was killed. Neither I, J. M. or Duncan Campbell were at any usual place the day that Williams was killed. Williams was killed in 1880. The reason I never said anything about this before was because I

was at Campbell's ranch, and had my stock at Campbell's ranch; and I never said anything about it for three and a half years afterwards because I was afraid they would kill me. McKenzie will tell the truth about what I told him before court met, as to what I was going to testify to before the grand jury, and as to what he, McKenzie, told Campbell before the grand jury met. I lived at Campbell's for about one and a half years after Williams was killed."

Re-direct: "I never told Campbell anything about overhearing the conversation. Mr. Alford will tell the truth about anything I may have told him about the killing. He may be mistaken about the subject matter in mixing another thing with this."

Recalled: "I did not tell Bowen on the Gould ranch last December, that I was afraid to go down about Lagarto, on account of the McNeil and Williams matter."

It was admitted that if Doctor Frazier was present he would testify that there was a wound on the back of John Williams's neck, seemingly inflicted by some sharp instrument; that he saw an old ax with a broken helve near where the body was found; that there was a little blood on the ax, but that he could not say that it was human blood, or how long it had been there; that he was with the jury of inquest and examined the body and wounds of the deceased.

Green Ussery was the next witness for the State. He testified that, in 1880, he knew both the deceased and the defendant. On the day that Williams was killed, in April, 1880, witness saw him at work on a fence. This was two or three hours before the killing. Witness rode up to where he was at work. Witness did not see the defendant there, but heard him calling. Deceased had on a pistol at that time. As the witness rode up, his horse shied, being frightened at Williams. Williams remarked that witness's horse was by him, as he, Williams, was by the Mexican; that witness's horse was afraid of him, and he was afraid of the Mexican, and that such fear was the reason he was wearing arms. Two hours afterward, Williams was killed. This was admitted over objections by the defense.

Cross-examined, the witness said that he did not know when Williams was killed, more than that it was that day. The Mexican Segura was not close enough for witness to see him. Deceased was excited, because, he said, the Mexican would kill him. He called the Mexican to tighten the wire. Witness then

left them. The defendant did not hear the conversation between the deceased and witness.

Judge M. F. Lowe was recalled by the State. He testified that the defendant made two statements concerning the killing on the day of the inquest. At the body, when Berksdale acted as interpreter, he said that the white man of the assaulting party struck deceased with the ax. Afterward, at the house, when Duncan Campbell acted as interpreter, he said that the deceased and the man hitched first, that the man struck deceased first with his fist, and then with the ax. These statements he made in Spanish, a language spoken and understood by witness. At this point the State closed.

Duncan Campbell was the first witness for the defense. He testified that he was the son of J. M. Campbell. He knew the defendant, and he knew the deceased when he was killed, on or about April 21, 1880. The witness was present at the inquest held at the house, and on that occasion acted as interpreter. The witness did not remember all that the defendant said in his statement before that inquest. He did remember, however, that the defendant said that a white man and two Mexicans came to the fence where he and deceased were at work, and that the white man killed the deceased. This statement the defendant made to the jury at the house. The defendant said that the white man shot the deceased, but witness did not remember that he said that the white man struck deceased. The deceased had been on J. M. Campbell's ranch for about six months. He, deceased, and the defendant always appeared very friendly. The defendant was indebted to J. M. Campbell at the time that the deceased was killed.

The witness had known John Donahue, the man whose written testimony was read by the State in this case, for eight or ten years. Witness and his father had no understanding with the defendant to kill the deceased. The relations between witness, his father and the deceased, had always been of the kindliest nature. J. M. Campbell could speak the Spanish language fluently, and needed no interpreter to deal with the defendant. The defendant was, at the time of the killing, living in a small house on the ranch. The deceased, his wife and child, lived in a store house on the ranch. Donahue was in deceased's house the night before the killing. The brush arbor spoken of by Donahue was about half way between J. M. Campbell's residence and the house occupied by the deceased. Two boxes.

each about two feet deep, stood under the arbor. No one could stand under that arbor without being seen. The two boxes spoken of were not piled the one on top of the other. The witness emphasized his denial that there ever was an understanding between himself, his father and the defendant, looking to the assassination of the deceased. The witness had no idea of the death of the deceased until he heard of his assassination. The deceased and defendant were together on the day of the homicide. Deceased expressed then no apprehension of being killed. He never at any time expressed fear of defendant, or his belief that defendant contemplated his murder. On the contrary, he and the defendant were always on friendly terms. The deceased never asked to be relieved from work with the defendant.

Cross-examined, the witness said that Donahue and the deceased occupied the same house on the ranch. The witness, though not positive, thought that Donahue spent the night before the killing in the deceased's house. The witness thought so because he saw Donahue on the ranch next morning. Deceased passed the night preceding his death at his house. The witness had never had a conversation with the deceased about hides on the place. About the time of the killing, the deceased was finishing up his work, and was going to leave the ranch. The arbor spoken of by Donahue was constructed of four poles stretched from four upright posts, the top covered over with brush, and was about eight or ten feet high. Two empty boxes and a half barrel stood under the arbor. It was utterly impossible for a man to have stood under that arbor and not be seen. The arbor shade might have produced some darkness.

Re-examined by the defense, the witness stated that the arbor squared about ten feet. There was no brush on the ground about it. The boxes were lying down on the ground, and the half barrel was off to itself, filled with sheep dip. Donahue habitually slept in the house of the deceased. He ate breakfast at the ranch on the day of the killing.

J. M. Campbell was the next witness for the defense. He testified that the defendant lived on his ranch five or six years. At the time of the death of Williams, the defendant was indebted to witness for three or four months' wages at the rate of twelve dollars per month. The witness's and the deceased's relations at the time of the killing were of the friendliest character. Witness knew John Donahue. Donahue ordinarily slept at the house of the deceased. The witness could not say that he slept

there on the night before the killing. The witness saw him on the ranch late that night, and early next morning before sunrise saw him coming from Williams's house. He ate breakfast at the witness's house on that morning (the morning of the killing), and witness saw him and the deceased together on that morning, on the ranch.

The arbor which figures in this trial was constructed of four forks, four to six inches in diameter, driven into the ground eight feet apart, of sufficient height for a tall man to stand under. Two bacon boxes were under the arbor, placed there to feed lambs in. One was turned upside down, to put milk on; the other was turned open side up, so placed that the wife of witness could stand in it when feeding lambs. The boxes were each about two feet in depth, and lay side by side. There was also a half barrel of sheep dip under the arbor. There were no barrels piled up under it. A child could not have stood in that arbor unseen. Witness never had an understanding with Duncan Campbell about the killing of Williams. He had never mentioned the subject of hides to Duncan Campbell, in connection with the deceased. He had never heard Williams say anything about hides. Williams was killed on April 21, 1880. The defendant was the first man who told the witness of the killing. He, defendant, came to the witness at his house, much excited, and told witness that a white man and two Mexicans came to where he and Williams were at work; that the white man and Williams quarreled; that the white man shot Williams, and that he himself received a blow. He said nothing about the white man striking Williams. He was very much excited, and said that he had no hand in the fight. Witness took his, defendant's, pistol from him, and found it loaded all around. The pistol was of forty-five calibre, the same sized pistol as that owned by Williams. There were no forty-five calibre cartridges on the ranch except those owned by Williams. Williams was to have left when the fence was finished. The witness did not, and would not have discharged him, as he was too desirable a hand. Williams was quitting voluntarily, saying that he was going to Louisiana. Williams had never said that he would tell things on the witness; he knew nothing to tell. Donahue left the witness's ranch in February, 1883, just before the March term of court convened. Witness kept a stallion when Donahue left, against Donahue's will, as it was witness's money which paid for the stallion, and that fact accounts for Donahue's enmity to

witness. Witness and Duncan Campbell were indicted in this case, at the March term of the court, 1883.

Cross-examined, the witness said that the defendant had his own pistol, and could get cartridges from no one on the ranch except Williams. He could not leave the ranch to get cartridges. Witness had no forty-five calibre cartridges. From the corner of the witness's house to the wool shed the distance is about one hundred and fifty yards. The arbor was between the houses of deceased and witness, but not in an exact line. It was high enough for a tall man to stand under, and was partly covered by brush. Neither a man nor a child could stand unseen under that arbor. A child could possibly secrete itself in the open box. The moon shone brightly on the night of the alleged conversation. The witness was out that night, and saw the moonlight. Reflection from the moonlight would not have produced darkness under the arbor. The defendant was crying when he told witness of the killing of Williams. It did not even enter the witness's mind that the defendant committed the homicide.

Mrs. J. M. Campbell was the next witness for the defense. She testified that she was the wife of the last witness. She knew the parties variously accused of this offense, and she knew deceased in his lifetime. Deceased, defendant, J. M. and Duncan Campbell and witness were all on friendly terms at the time the killing occurred. Witness had never known of the existence of unpleasant feelings between any of them. The arbor described by previous witnesses was originally built for washing purposes, but was not so used in April, 1880. Witness had some pet lambs on the place when Williams was killed. She fed them and cared for them under that arbor, and for that purpose had two boxes and a half barrel of sheep dip placed there. She stood in one of the boxes to prevent the lambs from soiling her clothes, and she fed them milk on the other box. There was no brush about the arbor except on top, nor was there other obstruction to the view inside that arbor at the time of the killing of Williams or afterward. The deceased lived in a house on the ranch with Donahue, and he and Mr. and Mrs. Williams were perfectly friendly. They, the Williamses, and Donahue were in the same house together on the night before the killing. There was no difficulty prior to the killing between any of the parties. Donahue had one wooden leg. An effort was made to keep Williams on the ranch.

Rufus Holland was the next witness sworn for the defense.

He testified that he knew Donahue. When he, witness, and Donahue were in prison together, Donahue told him that McNeil killed Williams. The witness had lived in the neighborhood since 1856, and knew Donahue's reputation for truth and veracity. It was not good. Witness would not believe him on oath.

Cross-examined, the witness said that he supposed the population of the town of Tilden to be about three hundred, and of the community, including Tilden, some four or five hundred. Out of this number he had heard six or seven persons say that they would not believe Donahue on oath. He heard these parties say so on the day of this trial. He had heard others make the same statement. These parties included W. P. Crain, James Lowe, senior, and Frank Drake. He had never heard any one say that they would believe Donahue on oath.

Mr. McKenzie testified that he had lived in Live Oak county since 1860, and was sixty years old. Witness knew John Donahue. Donahue told the witness that Campbell had no more to do with the killing of Williams than he, witness, had. On or about the eleventh day of August, 1883, previous to the fall term of court, Donahue came to the witness's house to early breakfast. As the witness entered the dining room, Donahue said to witness that he had been staying in the brush for several days, and that he had just came in, and had prevailed upon witness's daughter Mary Ann to get him some breakfast; that he had become somewhat frightened, and had been staying for some time at Alford's camp; that Campbell had men out hunting him to kill him. The witness replied to him: "You are in no danger. That is one of your old tales, and I see that Campbell has not killed you yet." Donahue then brought up the subject of the Williams murder, and said that he knew who killed Williams. Witness asked him if he meant to say that Mr. Campbell knew anything about it. He replied that he thought Mr. Campbell knew all about it. Witness then asked him: "John, what makes you talk that way?" He replied that Campbell had ridiculed him, and that he had to say something as an offset, or people would believe that he was a bad man; that if he, Donahue, was taken before the grand jury it would be "good-bye Campbell." Donahue's reputation for truth and veracity was bad, and, from his knowledge of that reputation, the witness would not believe him on oath.

On cross-examination, the witness said that he knew Donahue in Live Oak county, and had known him for ten years. He knew the opinion of Donahue entertained by his neighbors.

Donahue stayed in that neighborhood frequently as long as three months at a time. He had never remained in the neighborhood at any one time as long as three years. As long before this trial as three or four years the witness heard three or four persons say they would not believe Donahue on oath. He had heard others say so since. He had heard others say so before, among them Mr. McGivens. The words used by Donahue at witness's breakfast table were that "if he went before the grand jury it would be good-bye Campbell."

Green Alford testified, for the defense, that Donahue, on the Nueces river, told him that Duncan Campbell had no more to do with the murder of Williams than the witness had.

Major T. T. Teel testified, for the defense, that when the defendant was indicted he, witness, was acting as the prosecuting attorney. Donahue was examined before the grand jury, and said that he knew nothing at all about the killing. He was urged to tell all if he knew anything, but said first and last that he knew nothing.

Frank Drake testified, for the defense, that he was a member of the grand jury in June, 1880, when the Williams murder was investigated. Donahue was examined in regard to that killing, and said that he knew nothing about it.

Frank S. Dixon testified that he was foreman of the grand jury in June, 1880, and examined Donahue when the Williams murder case was under examination. Donahue said that he knew nothing about it. He said nothing about a plot.

Cross-examined, the witness said that Donahue adhered to his statement throughout the examinations before the grand jury, that he knew nothing about the killing of Williams. As he appeared to be an unwilling witness, prosecuting attorney Teel had him brought before the grand jury a second time, and examined him closely. From first to last he adhered to his original statement, that he knew nothing about the killing.

Wiley Williams testified, for the defense, that he knew the man Donahue. Two or three weeks after the killing of Williams, witness talked to Donahue about it. Donahue then stated positively that McNeil killed Williams, and that neither the defendant nor the Campbells had anything at all to do with it. Witness knew that Donahue's reputation for truth and veracity was bad, and he would not, knowing his reputation, believe him on oath.

Cross-examined, the witness stated that he first formed Dona-

hue's acquaintance in Live Oak county, in 1875. He had heard Mr. Harman, of Live Oak county, say that he would not believe Donahue on oath. He had never heard any one in McMullen county say that he would not believe Donahue on oath. Witness had heard Doctor Dilworth and Mr. Yarbrough say that they would not believe Donahue on oath.

R. S. Ray testified, for the defense, that he had known Donahue since 1875. They had lived about four miles apart, and the witness was, to some extent, acquainted with his reputation for truth and veracity, and knew, from what was generally said by people, that his reputation was very bad. Witness, knowing his reputation, would not believe him on oath. Witness could recall but few he had heard say so. He had never heard the district attorney or the district clerk say they would not believe Donahue on oath. He did hear the prosecuting attorney, when prosecuting Donahue for theft, denounce him as a thief, liar, scoundrel and villain, but not as a perjurer.

Among others, the question considered in the opinion was assigned as ground for new trial.

*J. M. Eckford*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. It appears from a bill of exception in the record that, upon the trial of this case, the state proved by one Ussery that on the morning of the day the deceased was killed, he, witness, rode up to where the deceased was at work; that deceased seemed agitated and excited, and told witness that he, deceased, was afraid of that Mexican, meaning the defendant; that this conversation occurred about two hours before deceased was killed; that defendant was at the time in sight, but was not near enough to hear said conversation between deceased and witness. This testimony was objected to by the defendant, because it was hearsay and not part of the *res gestœ*, and the statements of deceased were not made in the presence of the defendant.

We think the court erred in admitting the testimony. It was clearly hearsay, and did not come within any of the exceptions to the general rule which rejects hearsay evidence. (*Campbell* v. *The State*, 8 Texas Ct. App., 84; *Green* v. *The State*, Id., 71; *Booth* v. *The State*, 4 Texas Ct. App., 202; *Anderson* v. *The*

*State*, 14 Texas Ct. App., 49; *Hammel* v. *The State*, Id., 326.) Under the peculiar circumstances of this case, this illegal evidence was material, and calculated to affect the defendant prejudicially. But whether or not it was prejudicial to the defendant, its admission was such error as must reverse the judgment. (*Tyson* v. *The State*, 14 Texas Ct. App., 388.)

Several other questions are presented in the record, and in the brief of counsel for defendant, but they are not such as are likely to arise on another trial of the case, and, not being of general importance, we deem it unnecessary to consume time in their investigation and decision.

Because the court erred in admitting incompetent testimony, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered May 17, 1884.